# EXHIBIT E

**WIENGARTEN** [illegible]

This statement may be used when a worker [illegible] disciplinary hearing: [ I believe this discuss[illegible] my being disciplined. I therefore request [illegible] Representative or Officer be present to ass[illegible] meeting. I further request reasonable time [illegible] my Union Representative regarding the subject [illegible] of the meeting. Please consider this a continuing [illegible] without representations. I shall not participate [illegible] discussion. I shall not consent to any search [illegible] my person, property or effects without first consulting [illegible] my Union Representative.]

**SERVICE EMPLOYEES INTERNATIONAL [illegible]**
**LOCAL 24/7**

Local 24/7 SEIU
2201 Broadway, Suite # 101
Oakland, CA 94612
[illegible] 1-800-77[illegible]
Fax: (510) 625-[illegible]

# AGREEMENT

Between

**SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 24/7 IUSO**

Local 24/7 SEIU

and

**ABM SECURITY/ AMERICAN COMMERCIAL SECURITY SERVICES**

**ALLIED SECURITY / BARTON PROTECTIVE**

**COGNISA SECURITY, INC.**

**FORBES SECURITY**

**GUARDSMARK, INC.**

**LIGOURI ASSOCIATES, INC.**

**PROFESSIONAL TECHNICAL SECURITY SERVICES, INC.**

**SECURITAS COMPANY**

**SENTINEL GUARD SYSTEM**

**UNIVERSAL PROTECTIVE SERVICES**

*(Effective July 1, 2003 through June 30, 2007)*

July 21, 2003

Ref. No. L-0051/VII/03/SM/im

Dear Fellow Security Officers;

This document is something we should all be proud of.

This document is the first-ever Master Contract for Bay Area security officers. No document better embodies the time, sweat and energy that security officers have begun to dedicate to building our new union than this one.

This Bay Area-wide Collective Bargaining Agreement, only the second of its kind in the nation for security officers, is a milestone for our union. When you look through this agreement, you will see that security officers are now guaranteed, for the first time ever, paid holidays, paid sick days, regular pay raises, an allowance to pay for uniform cleaning and, by the end of the contract, full company-paid health insurance.

These gains are the foundation of what will become even better contracts in the years to come. Most importantly, these gains are the direct result of the active participation in our union of hundreds of security officers.

To win this contract, SEIU Local 24/7 members participated in demonstration and marches, organized and led delegations to the management of our companies, met with and received supports from political leaders and public safety officials, spoke to the news media, handed out leaflets to building tenants, and most importantly, talked to our co-workers about what it takes to win a great contract.

Now it is up to us to continue to build our union by staying active, talking to each other at work about our issues, and organizing non-union security officers so that we grow stronger together.

Our vision is to improve the security profession so that all officers are well-compensated, well-trained, and well-respected. By staying active in our union, we will ensure that vision is realized.

In solidarity,

Steve McClenathan
President, SEIU Local 24/7



## TABLE OF CONTENTS

PREAMBLE ... 1
ARTICLE 1 - RECOGNITION ... 1
ARTICLE 2 - UNION SECURITY ... 2
ARTICLE 3 - NO DISCRIMINATION ... 3
ARTICLE 4 - DISCIPLINE AND DISCHARGE ... 3
ARTICLE 5 - NO STRIKES ... 4
ARTICLE 6 - UNION REPRESENTATIVES ... 5
ARTICLE 7 - TRAINING ... 6
ARTICLE 8 - PROBATIONARY PERIOD ... 6
ARTICLE 9 - SENIORITY ... 7
ARTICLE 10 - JOB VACANCIES ... 9
ARTICLE 11 - SCHEDULING ... 9
ARTICLE 12 - WAGES ... 10
ARTICLE 13 - WORKWEEK ... 10
ARTICLE 14 - HOLIDAYS ... 11
ARTICLE 15 - UNIFORMS ... 13
ARTICLE 16 - FARES AND TRAVEL ... 13
ARTICLE 17 - VACATIONS ... 14
ARTICLE 18 - SICK LEAVE ... 16
ARTICLE 19 - HEALTH & WAREFARE ... 17
ARTICLE 20 - RETIREMENT ... 17
ARTICLE 21 - PAY PERIODS ... 17
ARTICLE 22 - BIDDING PROCEDURES ... 18
ARTICLE 23 - LEAVES OF ABSENCE ... 19
ARTICLE 24 - GENERAL CONDITIONS/RULES ... 20
ARTICLE 25 - GRIEVANCE AND ARBITRATION PROCEDURE ... 21
ARTICLE 26 - MOST FAVORED NATIONS ... 24
ARTICLE 27 - MANAGEMENT RIGHTS ... 24
ARTICLE 28 - WAIVER ... 25
ARTICLE 29 - DURATION AND TERMINATION ... 26
AGREEMENT WITH FORBES SECURITY ... 28
SIDE LETTER OF UNDERSTANDING ... 29
SIDE BAR LETTER OF UNDERSTANDING – ABM SECURITY ... 30
AGREEMENT WITH ALLIED SECURITY ... 31
ALLIED/ SEIU LOCAL 24/7 – ATTACHMENT II ... 32
ALLIED/ SEIU LOCAL 24/7 – ATTACHMENT III ... 33
MEMORANDUM OF UNDERSTANDING – SENTINEL, INC. ... 34

## TABLE OF CONTENTS
## AGREEMENT BETWEEN SEIU LOCAL 24/7 AND GUARDSMARK, INC.

AGREEMENT BETWEEN SEIU LOCAL 24/7 AND GUARDSMARK ... 36
PREAMBLE ... 37
ARTICLE 1 - RECOGNITION ... 38
ARTICLE 5 - NO STRIKES ... 39
ARTICLE 12 - WAGES ... 40
ARTICLE 14 - HOLIDAYS ... 42
ARTICLE 19 - HEALTH AND WELFARE ... 44
ARTICLE 20 - RETIREMENT ... 45
ARTICLE 29 - DURATION AND TERMINATION ... 46
NOTE ... 47
SIDE LETTER ... 48

## AGREEMENT

*Preamble*

This Agreement is entered into on July 1, 2003, between SEIU, Local 24/7 IUSO (hereinafter referred to as "the Union") and ABM SECURITY SERVICES/ AMERICAN COMMERCIAL SECURITY SERVICES (collectively "ABM"), ALLIED SECURITY, INC., BARTON PROTECTIVE OF CALIFORNIA, INC., COGNISA SECURITY, INC., FORBES SECURITY, GUARDSMARK, INC., LIGOURI ASSOCIATES, INC., PROFESSIONAL TECHNICAL SECURITY SERVICES, INC., SECURITAS SECURITY SERVICES COMPANY USA, INC., and UNIVERSAL PROTECTIVE SERVICES (hereinafter each referred to individually as the "Employer").

In entering into this Agreement, the Union and the Employer recognize that the single greatest threat to their continued success is the proliferation of non-union competition in the security industry. As such, it is imperative that the Union and the Employer work together to preserve union jobs by supplying clients with the best possible security services. To this end, the Union and the Employer agree to resolve their problems through the procedures provided for in this contract and not by taking internal disputes to the customer for resolution. Only by cooperation and understanding each other's needs and the realities of the market place, can both the Union and the Employer prosper.

## ARTICLE 1
## RECOGNITION

The Employer recognizes the Union as the exclusive representative for the purpose of collective bargaining of all employees employed by the Employer in the City and County of San Francisco, and in the counties of Alameda (excluding the cities of Hayward, Newark, Fremont, Union City and UPS facilities) and Contra Costa, including within the San Francisco International Airport, as guards, watchmen, patrolmen, fire and patrol, and/or security officers who are not covered by the Waterfront Agreement; excluding all office employees and supervisory employees, as those terms have been defined under the National Labor Relations Act, as amended, provided existing non-Union accounts in Alameda, Contra Costa and within the San Francisco International Airport, shall not be subject to the terms of this Agreement until the termination of the contractual agreement with the client. If the Employer has accounts that are unionized as of June 5, 2003, in the cities of Hayward, Newark, Fremont or Union City, said accounts will be covered by this Agreement.

Ligouri and ProTech shall each red circle two (2) accounts so that the economic terms of this Agreement shall not apply until the termination of the client's agreement.

## ARTICLE 2
## UNION SECURITY

1. It shall be a condition of employment that all employees of the Employer covered by this Agreement who are members of the Union in good standing on the effective date of this Agreement shall remain members in good standing and those who are not members on the effective date of this Agreement shall, on the thirtieth day following the effective date of this Agreement, become and remain members in good standing in the Union. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its effective date shall, on the thirtieth day following the beginning of such employment, become and remain members in good standing in the Union.

   Membership in the Union shall be available to each employee on the same terms and conditions generally applicable to other members of the Union and shall not be denied or terminated for reasons other than the failure of such employee to tender the periodic dues and the initiation fee uniformly required as a condition of acquiring or retaining membership.

   The Employer shall make known to any new hire their obligations under this provision, and present such new hire at that time, union membership materials including a membership application and voluntary payroll deduction authorization.

2. On a monthly basis, the Employer shall notify the Union of new hires and terminations providing name, Social Security number, and known address and telephone number. The Employer will notify the Union of known changes of address or phone numbers on a monthly basis.

3. The Employer agrees to deduct from the payrolls all initiation fees and periodic dues as required by the Union upon presentation by the Union or the employee of individual authorizations as required by law, signed by the employees directing the Employer to make such deductions from the employee's pay period each month and remit same to Union.

4. The Union will furnish the forms to be used for authorization. The Employer will furnish the Union with a duplicate copy of all signed authorizations, unless another procedure has been adopted.

5. The Union will hold the Employer free and harmless against any and all claims, damages, suits or other forms of liability whatsoever that shall arise out of or by reason of action taken by the Employer for the purpose of complying with any of the provisions of Article 2.

**ARTICLE 3**
**NO DISCRIMINATION**

The Union and the Employer agree they shall not discriminate in violation of federal or state law against any applicant or employee in hiring, promotions, assignments, suspensions, discharge, terms and conditions of employment, wages, training, recall or lay-off status, because of race, color, ancestry, religion, creed, national origin, age, sex, maternity status, sexual orientation or against a qualified individual with a disability (defined by the Americans with Disabilities Act). No employee or applicant for employment covered by this Agreement shall be discriminated against because of membership in the Union or activities on behalf of the Union.

**ARTICLE 4**
**DISCIPLINE AND DISCHARGE**

1. The Employer shall be free to discharge employees for refusal to obey lawful orders, in competency, misrepresentation, intoxication, or any just cause. An employee who has not completed his or her probationary period may be disciplined or discharged without just cause and without recourse to the Grievance and Arbitration procedure set forth in Article 25.

2. The Employer shall be free to discipline any employee who commits an infraction, which, while not being sufficient to constitute just cause for discharge, is sufficient to warrant some lesser disciplinary action. However, no employee who has completed the probationary period will be discharged for offenses which do not in and of themselves constitute just cause for discharge unless the employee has received two (2) prior written warnings within twelve (12) months of the offense. Warning notices shall be issued within ten (10) days after the Employer knew or should have known of the offense. A copy of the warning shall be sent to the Union. Each warning notice shall contain a place for the employee to sign to acknowledge receipt without admitting guilt.

3. In addition to those circumstances mentioned elsewhere in this Agreement, just cause circumstances for discharge shall include, but not be limited to: unlawful use or unlawful possession of controlled substances, intoxication, insubordination, theft, excessive absenteeism, gross negligence, failure to comply with reasonable rules, policies or directives promulgated by the Employer and clearly communicated to the employee, use of unnecessary force or disrespectful treatment of a tenant; visitor or employee and inability or unwillingness to be trained to fulfill existing or modified security needs of the Employer, the building owner or its tenants. The Union further understands and agrees that the Employer provides an important service to its tenants of a personalized nature to fulfill their security needs, as those needs are perceived by the Employer, the building owner and the tenants. Accordingly, the provisions of this Section shall be implemented and

interpreted by the parties and by an arbitrator in arbitration proceedings so as to give significant consideration to such needs.

4. The Employer will discharge any employee who is denied registration or whose registration is canceled by the Department of Consumer Affairs of the State of California or any other governmental agency. Any employee, who by reason of the requirements of his job assignment must pass a test prescribed by any governmental agency or obtain a permit from any governmental agency and is not able to pass the test to obtain such a permit, shall be removed from the job. The employee will then be offered the first available job for which the employee is qualified that becomes available within the same dispatch area. If the employee refuses the first available job for which the employee is qualified and which is located in his community of residence, he may be permanently removed from the payroll. Discharge under this Article for failure to possess a license shall be without recourse to the Grievance Procedure of Article 25.

5. The Employer will notify the Union at the time of termination of any employee under paragraphs 1 or 3 above.

6. The employee and the Union recognize that the customer is the ultimate consumer and ultimately controls the access of the employee, and the business of the Employer. When a security related incident occurs on a job site that is or can reasonably be construed as injurious to that customer, the employee, the Union, and the Employer will cooperate in every way in the investigation of the incident until the incident is resolved and/or the customer is satisfied that all reasonable avenues have been pursued to their completion. The Union will not impede any steps which may assist the Company in convincing the customer of the thoroughness and/or reliability of its investigation consistent with the Union's duty to provide fair and effective representation to its membership.

**ARTICLE 5**
**NO STRIKES**

There shall be no strikes (including unfair labor practice and sympathy strikes), work stoppages, job action, distribution of literature regarding any labor dispute on the property of any client of the Employer or by an employee in uniform at any time, or lockouts, during the term of this Agreement. In the event of a strike by another labor group involving the client's property or operations, the employees will remain on the job for protection of life, limb, property, and maintenance of fire watch on the client's premises. They shall not be required to assume non-security type duties normally performed by striking employees.

Further, security employees shall not be subject to penalty of punishment by the Union for performances of assigned duties at any time.

These duties are recognized as including the apprehension, identification and reporting of and giving evidence against any persons who perform or conduct themselves in violation of work rules or applicable laws while on the Employer's or the client's premises. Violation of the provisions of this Article will subject security employees to disciplinary action up to and including discharge. Such disciplinary action shall be subject to the grievance and arbitration procedure of this Agreement.

The Employer will reimburse a guard or patrolman for damages incurred to his personal property as a result of the performance of his assigned duties under strike conditions. In order to be eligible for such reimbursement, a guard or patrolman must:

(a) Report to the Employer as soon as reasonably possible, in writing, all of the facts and circumstances regarding damages incurred;

(b) Have exercised reasonable care for the safety of his personal property; and

(c) Complied with the Employer's reasonable instructions regarding such property.

The Employer will be responsible to make payments under this paragraph only with respect to property which is damaged within the immediate area of the site of the employee's work. The Employer will have the option of paying to the employee either (a) the cost of repairing the damaged property, or (b) the value of the property prior to it being damaged, whichever is lower.

## ARTICLE 6
## UNION REPRESENTATIVES

1. Official representatives of the Union shall be allowed to visit the Employer's premises and offices, and to visit the employees on the job for the purpose of determining that this Agreement is being carried out, provided that there shall be no interference with the business of the Employer, there is no objection by the Employer's clients, and that the visit is conducted within the client's established access control procedures. Any Union official who wishes to visit or contact employees while on the job, shall notify in advance the Employer's management of his or her intention to do so prior to their anticipated arrival on the job site or the Employer's office, with two (2) business days' notification and specify the property he or she intends to visit.

2. The Union may inspect dispatch sheets weekly. The Union will give the Employer at least two (2) business days notice prior to inspecting such dispatch sheets.

3. The Employer may permit the posting of Union bulletins at the Employer's premises and sites in designated areas, provided such bulletins do not disparage the Employer or the client.

4. Union steward, or alternate stewards in their absence, shall have reasonable freedom to perform their duties during nonworking time so long as it does not interfere with the performance of any employee's security duties, provided that on giving the Employer notice, the steward shall be entitled to remain on a client's premises to perform their Union-related duties during their nonworking times. The Employer shall recognize up to one (1) shop steward per every fifty (50) security officers employed by the Employer, no more than one (1) steward per site. Stewards shall be selected by the Union. The Union shall notify the Employer in writing of the names of all stewards at the time of selection. Any change in shop stewards will also be communicated in writing to the Employer. Stewards are authorized to meet with the Employer's branch management on an unpaid basis, should he or she desire to meet with the steward, for the purpose of disposing of problems on an informal basis at job sites so long as it does not interfere with the performance of the steward's security duties.

5. The Union may request and obtain the release of employees selected for official Union business (*e.g.*, training programs, union conference/convention, etc.) on an unpaid basis provided at least two (2) weeks' advance notification in writing is given to the Employer. In addition, the Union may designate members to be released without pay for representation/organizing matters, with at least five (5) business days' advance notice when possible. No more than one (1) employee per every fifty (50) employees will be requested for any release from their scheduled work time. Such leave will be granted for the period required to fully carry out said business provided such leave does not exceed fifteen (15) working days per calendar year unless the Employer consents to additional time off for the affected employee(s). Reasonable time off to participate in local collective bargaining negotiation meetings involving the employee's Employer will not be restricted, unless for emergency situations. During all such leaves provided for in this Article seniority shall continue to accumulate and accrue.

## ARTICLE 7
## TRAINING

1. Representatives of the Union and Employers signatory to this Agreement shall meet and confer to establish a joint labor and management industry undertaking to develop an organized planned system of training and accreditation, identifying clients needs, surveying security practices and developing a measurable qualifications program. The parties agree to jointly request BOMA San Francisco to join the committee.

2. Employees shall be paid at straight-time rate for all training required by the Employer or mandated by law. Any work (including mandatory training hours) if over eight (8) hours in a workday or forty (40) hours in a workweek shall be paid at time-and-one-half.

## ARTICLE 8
## PROBATIONARY PERIOD

1. An employee shall be employed on a probationary period for ninety (90) days from the date of employment. At the sole discretion of the Employer, the employee may be terminated during this period without recourse to the Grievance Procedure by the employee. After ninety (90) days, the employee is considered a regular employee and will be placed on the seniority list dating from the date of employment.

2. The ninety (90) calendar day limitation will not apply to an employee if it is found that the information given in the application for employment is false or materially incomplete. He may be terminated without recourse to the Grievance Procedure set forth in Article 25, except on the issue of whether the application is false or materially incomplete. If the arbitrator finds that the application is false or materially incomplete, the discharge will be sustained.

3. Unexcused absence during the probationary period will not be counted toward the completion of the probationary period.

## ARTICLE 9
## SENIORITY

1. Seniority shall be defined as an employee's length of service measured from his or her most recent date of hire with the Employer.

2. An employee shall not have seniority during the first ninety (90) calendar days of employment, which shall be considered an orientation period. During this time, the Employer may discharge the employee, who shall have no recourse to the grievance-arbitration procedure. Upon completion of the orientation period, an employee's seniority will revert to his or her original date of hire.

3. The Employer shall maintain at its office a seniority list showing employees' dates of hire. Seniority lists shall be made current as of March 1st and September 1st each year, and shall be furnished to the Union upon request.

4. Nothing contained in this Agreement shall be deemed to restrict the Employer's right to temporarily or permanently assign an employee to or among other buildings covered by collective bargaining agreements with the Union to which the same Employer is signatory; provided, that temporary assignments (not to exceed sixty (60) calendar days) shall have

no effect upon the employee's seniority, and the employee shall, during the period of such temporary assignments, continue to retain and accrue seniority, wages and benefit eligibility as if they had not been temporarily assigned; provided further, that permanently reassigned employees shall, upon reassignment, be credited with all accumulated seniority and receive the wage rates and benefit eligibility in effect at the new building location and shall in addition continue to retain and accrue seniority at their new building location as if they had started work at said location.

5. Seniority shall be broken by any of the following events:

   a. Resignation, retirement, or voluntary termination;

   b. Just-cause discharge;

   c. Voluntary promotion into any non-bargaining unit position;

   d. Layoff exceeding one hundred eighty (180) days;

   c. Inactive employment for any reason exceeding one (1) year or one's length of seniority which is less;

   f. Failure to report within seven (7) calendar days from the date a recall notice is mailed to the employee's most recent address appearing on the Employer's records, unless prior written notice is received by the Employer;

   g. Failure to return to work after any leave within seven (7) calendar days after a scheduled date for return unless prior written notice is received by the Employer.

6. Assignments, promotions, layoffs and recalls shall be determined on the basis of seniority provided in the opinion of the Employer, the employee is qualified, suitable and available to work. Seniority shall be determinative when all other job-related factors are equal. The Employer's sole discretion shall be determinative in making such decisions, and such shall not be unreasonably exercised.

7. Laid-off employee shall not be permitted to bump a less senior employee at another location/site, but shall be permitted to obtain a vacant position at another location/site consistent with the provisions of Section 6, above. If there are no such vacant positions, the employee shall be permitted to exercise his or her seniority for a position, which becomes available, consistent with Section 6. The Employer will give first consideration to filling vacancies to employees on a recall list.

## ARTICLE 10
## JOB VACANCIES

1. When an employee has been assigned to a permanently assigned position at a particular job site by the Employer and any other permanent position arises at that job site, the Employer will give first consideration to the employee assigned to that job site who is qualified and avalable and also has the most seniority.

2. In the event a promotional opportunity arises at the job site, in deciding on the employee to be promoted, all employees steadily employed at the job site will be considered along with other persons, with respect to the following factors:

   a) Seniority;

   b) Qualifications;

   c) Availability;

   d) Appearance;

   e) Prior work record;

   f) Leadership skills; and

   g) Supervisory skills, as required.

   Where all factors other than seniority are equal, an employee with the greatest seniority employed on the job site shall be selected over all others.

3. The Employer will maintain a current posting of permanent job openings in the dispatch office of each branch. An employee who desires to change site location, work assignment or shift shall submit a written request to the Employer's designated representative. The Employer will respond to such request within five (5) business days of receipt.

## ARTICLE 11
## SCHEDULING

The Employer shall be responsible for assigning personnel to jobs. All personnel assignments and reassignments will be determined solely by the Employer taking into consideration Article 10 - Job Vacancies.

## ARTICLE 12
## WAGES

1. The starting hourly wage rates for employees shall be as follows:

| | Effective on Signing | 01/01/04 | 01/01/05 | 01/01/06 | 01/01/07 |
|---|---|---|---|---|---|
| San Francisco | $10.25 | $10.50 | $10.75 | $11.00 | $11.30 |
| Alameda and Contra Costa | $8.50 | $ 8.75 | $ 9.00 | $9.25 | $9.55 |

2. The hourly wage rates of employees shall be increased as follows:

| 09/01/03 (if no raise given in 2003) | 01/01/04 | 01/01/05 | 01/01/06 | 01/01/07 |
|---|---|---|---|---|
| .25 | .25 | .25 | .25 | .30 |

3. No employee employed on the date this Agreement is signed will suffer a reduction in his or her hourly wage rate as a result of the parties signing this Agreement.

## ARTICLE 13
## WORKWEEK

1. Forty (40) hours shall constitute a normal workweek, but there is no guarantee of hours. All time worked in excess of forty (40) hours per workweek shall be paid at one and one-half (1-1/2) times the employee's regular hourly rate of pay. All time worked in excess of twelve (12) consecutive hours in a workday shall be paid at two (2) times the employee's regular hourly rate.

2. All time worked in excess of eight (8) hours per work day in a fifteen-(15) hour period shall be paid at the rate of one and one-half (1-1/2) times the employee's regular hourly rate of pay.

3. Work assignments, whenever possible, shall be made so that an employee will have a sixteen (16) hour rest period within any twenty-four (24) hour work period. The Employer shall, to the extent practicable, use its best efforts to avoid the situation of an employee working more than twelve (12) consecutive hours.

4. The Employer may change the regular schedule of its employees at any time for any reason not limited to employee call-offs, schedule changes, vacations, illness and other situations. The Employer will make a reasonable effort to provide the employee with reasonable notice of any schedule change whether permanent or temporary.

5. When an employee is working in an emergency situation where the period exceeds twelve (12) hours, and the employee has made an effort to notify the Employer of the situation, the Employer will make a reasonable effort to arrange for the employee to eat after twelve (12) hours and every six (6) consecutive hours thereafter. If the Employer fails to provide a meal, the employee shall be paid in lieu thereof fifteen ($15.00) dollars per meal in the next pay period.

6. Each full-time employee shall be entitled to thirty (30) minutes of paid non-working time per day which shall be taken in two rest periods; provided, that if the Employer has previously specified relief time in excess of that provided herein, such additional relief time shall continue to be provided to security employees who are employed by the employer who were as of the date of this agreement receiving such additional specified relief time. Employers who comply with this provision shall be deemed to have complied with and satisfied the provisions of California law with respect to rest periods. An employee who did not receive a rest break must indicate such on his or her time card or Daily Activity Report for that week and initial such in the box indicating such, otherwise the Employer may assume that the employee received all rest breaks as required by law. Disputes regarding rest breaks shall be resolved only in accordance with Article 25 (Grievance and Arbitration Procedure], and the grievance may be filed within the time allowed by law, provided that after exhausting said Grievance and Arbitration Procedure, the employee may then utilize other available legal means.

## ARTICLE 14
## HOLIDAYS

Provisions 1-8 below to be effective January 1, 2004; except that Section 3 will be effective for the following holidays in 2003: July 4th, Labor Day, Thanksgiving and Christmas.

The Employer may continue the holiday policies and procedures set forth in their preceding collective bargaining agreement for the remainder of 2003, except as modified in Section 3.

1. The following eight (8) holidays (per section 9 herein) shall be recognized for all employees on the days on which they are legally observed:

| | |
|---|---|
| Thanksgiving Day | Memorial Day |
| Christmas Day | July 4th |
| New Year's Day | Labor Day |
| Martin Luther King, Jr. Day | |

2. Work performed on any holiday enumerated in paragraph 1 above, shall be paid for at one and one-half (1½) times the basic hourly rate. All work on such holidays in excess of eight (8) hours shall be paid at two (2) times the

basic hourly rate. Holiday pay at premium rates will be paid for hours worked within the twenty-four (24) hour calendar day of the holiday.

3. For purposes of the holidays listed in paragraph 1, all officers who are regularly scheduled to work that day of the week, but do not work due to their regular work location being closed, will be paid eight (8) hours regular straight-time pay.

4. In order to qualify for holiday pay, employees must work their last regularly scheduled shifts before the holiday and their next regularly scheduled shifts following the holiday, provided, that employees who are absent on one (1) or more such days due to approved vacation or sick leave shall be entitled to holiday pay, and provided further, that employees who are absent on one or both of such days due to FMLA leave, or medical leave or personal leave previously approved by the Employer, shall be entitled to receive holiday pay only upon their return to active employment.

5. Employees scheduled to work on a holiday who do not report for work and fail to call in prior to their starting time shall not be eligible to receive holiday pay. Any employee who takes an extra day off in connection with the holidays provided for in this Article for reasons not justified, shall be subject to progressive discipline by the Employer.

6. On state and national general election days, the work shall be arranged so as to allow the employees time to vote without loss of pay.

7. The Employer will make every effort to schedule work for any full-time employee who requests it, whose regular shift is cancelled on a holiday.

8. The first eight (8) hours of work performed at the holiday overtime rate shall be considered straight time in determining when overtime shall become payable under the Fair Labor Standards Act. Payment of overtime for holidays worked shall not relieve the Employer from payment of overtime for hours worked in excess of forty (40) hours a week or eight (8) hours a shift as provided in Article 12. There shall be no pyramiding of premium or overtime pay for the same hours worked.

9. An employer who signs and becomes a party to this Agreement prior to September 1, 2003, shall include Presidents' Day as a paid designated holiday in Section 1 in 2006. An employer who signs and becomes a party to this Agreement on or after September 1, 2003, shall include Presidents' Day as a paid designated holiday in Section 1 immediately on date of signing.

10. Ligouri, ABM, Barton and Pinkerton agree to pay employees who work on July 4th, Labor Day, Thanksgiving and/or Christmas double time for the hours they work on said days through December 31, 2003. Effective January 1, 2004, Section 2 of this Article shall apply.

## ARTICLE 15
## UNIFORMS

1. All uniforms and equipment as required shall be furnished by the Employer without cost to the employee. The Employer will determine its own requirements as to uniform and those items specifically required by the Employer will be furnished by it.

2. The Union recognizes that such uniforms are a cost to the Employer and must be returned at time of termination. The mechanics of withholding a deposit or retainer by the Employer are at the Employer's and employee's mutual agreement, the sum not to exceed One Hundred Twenty-Five ($125.00) Dollars for all employees.

3. Where special equipment such as firearms is supplied, a deposit may be required of the employee. The amount of such deposit shall be negotiated by the Employer and the Union. Uniform deposits shall be returned to the employee upon termination, provided that such uniforms, apparel and equipment are returned in reasonable condition (reasonable wear and tear excepted.)

4. The employee shall have an obligation to purchase and wear black socks, shiny black shoes (unless exempted from the shine requirement by the Employer because of the nature of site of work), and a black belt.

5. Uniformed employees shall be paid a uniform maintenance allowance of Two Dollars ($2.00) per day worked unless the Employer or the client provides cleaning for the uniform. If an Employer presently provides uniform maintenance reimbursement as part of an employee's hourly wage rate, it shall separate such reimbursement payment from the hourly wage rate and show the apportionment on the employee's check stub. In its sole discretion, an Employer may pay a uniform maintenance allowance of more than Two Dollars ($2.00) per day worked.

## ARTICLE 16
## FARES AND TRAVEL

1. A reporting allowance shall be paid by the Employer in accordance with the following:

   (a) During work hours, employees will not be required to use their personally owned vehicle for any reason at any time.

   (b) An employee will not be compelled to accept work assignments outside of the city and county of San Francisco.

   When an employee voluntarily accepts a special assignment outside of the city and county of San Francisco, the employee shall be paid thirty-two ($0.32) cents per mile plus tolls required to reach such

assignments from the normal assigned location or the appropriate reimbursement for the transportation chosen by the employee.

2. All employees will be reimbursed for telephone calls made regarding customer or operations business matters provided a written request for reimbursement, along with supporting documentation, is submitted timely to the Employer in accordance with its policies. Telephone calls seeking work, assignments, or personal matters shall not be reimbursed.

## ARTICLE 17
## VACATIONS

1. For purposes of this Article, the following definitions shall apply:

   A. Anniversary date is the first day worked by an employee for the Employer with respect to his or her most recent period of employment, as defined in Article 9, Seniority.

   B. Continuous service is a period of uninterrupted or broken service starting from an employee's anniversary date and ending with the last day worked. Continuous service shall be interrupted or broken by any of the following:

      (I) An event which would cause a break in an employee's seniority; or

      (II) Failure of an employee who has not been laid-off or is not on authorized leave of absence to perform work for thirty (30) days when work is available.

2. Vacations will be paid at the employee's regular straight-time hourly rate at the employee's most recent anniversary date.

3. Upon completion of one (1) year continuous service of at least one thousand six hundred (1600) working hours, an employee shall be entitled to five (5) days (i.e., 40 hours) vacation pay. Each regular employee who has continuous service with the Employer and who qualified for his or her full vacation each year, will be covered by the following schedule of maximum vacations:

   - 1 year continuous service, 5 days (40 hours)
   - 3 years continuous service, 10 days (80 hours)
   - 6 years continuous service, 15 days (120 hours)
   - 15 years continuous service, 20 days (160 hours)

4. An employee must satisfy both the continuous service and the hour requirements to qualify for a vacation, whether full or partial. Qualifications for full vacation are both one (1) year of continuous service and a minimum

of one thousand six hundred (1600) working hours in such period of continuous service.

5. Partial vacations will be paid to those who meet the hours and service requirements stated herein, either upon termination or upon their anniversary date. Partial vacation shall be a half vacation. No other partial vacation shall be paid in any circumstances. The requirements for partial vacation are six (6) months or more of continuous service and eight hundred (800) or more hours within the period described above. No partial vacation will be due during the employee's first year of employment. An employee who has not held six (6) months of continuous service or eight hundred (800) hours in his or her latest period will not be entitled to or vested with a vacation. Partial vacations shall be paid at ½ of the scheduled level reached at the employee's last anniversary date.

6. Selection and preference as to time of taking vacations shall be granted to employees on the basis of seniority, except that a building may depart from seniority in vacation scheduling where it is required in order to maintain normal operations of the building, in which event the Union shall be notified as soon as possible of the departure from seniority.

7. Employees required to work on scheduled vacation day(s) shall be paid for hours worked on such day(s) at one and one-half (1-1/2) times their regular hourly rate in addition to vacation pay, provided, however, that the foregoing shall not apply if the Employer and employee agree to reschedule the previously scheduled vacation day(s).

8. Any employee who has been in the service of an Employer for more than one (1) year and whose employment is terminated for any reason, shall be paid vacation on a pro rata basis, unless a deduction is allowed by law.

9. Employees will be paid vacation in accordance with the employer's normal payroll procedures. An employee may accrue up to a maximum of 160 vacation hours at any time, but upon an employee reaching 160 vacation hours, the Employer will cash out 40 of the employee's accrued vacation hours. In addition, the Employer and the affected employee may mutually agree to a cash out payment of his or her accrued vacation.

10. The Employer shall continue the vacation policies and procedures as set forth in its preceding collective bargaining agreement where current schedules exceed the schedule in Section 3; such schedule will remain in effect for employees hired prior to July 1, 2003, until the above schedule equals or exceeds the previous schedule.

## ARTICLE 18
## SICK LEAVE

1. Effective January 1, 2005, an employee who has completed at least one (1) year of employment with the Employer shall become eligible to receive one (1) paid sick day for use due to a bona fide illness or injury as provided for herein.

2. Effective January 1, 2006, an employee who has completed at least one (1) year of employment with the Employer shall become eligible to accrue paid sick at the rate of one (1) sick leave day per every six (6) month worked with the Employer for use due to a bona fide illness or injury as provided for herein.

3. To receive paid sick leave, an eligible employee must notify his or her supervisor of his or her inability to report to work as scheduled at least four (4) hours prior to his or her scheduled starting time.

4. Sick leave shall be paid at the rate of eight (8) hours per sick day.

5. Sick leave may be accrued up to a maximum of two (2) sick days.

6. Sick leave will be provided to supplement either State Disability benefits or Workers' Compensation benefits and will be paid as follows:

   a) Eligible employees entitled to State Disability benefits or Workers' Compensation shall have weekly benefits, for the two hundred twenty (220) hours prescribed, supplemented by their Employer to an amount equal to one hundred percent (100%) of their normal straight-time earnings, less any statutory deductions. The two hundred twenty (220) hours shall refer only to the maximum amount of time off under the sick leave provision; it shall not be construed as referring to the total amount of payment to which an employee is entitled where either State Disability benefits or Workers' Compensation is paid.

   b) Eligible employees are all employees with a minimum of one (1) year continuous service, with a minimum of one thousand six hundred (1,600) working hours during the previous anniversary year, are entitled to two hundred twenty (220) hours of sick leave per year. In no event is an employee entitled to take more than two hundred twenty (220) hours, (27.5 ) days off per year under this sick leave provision.

   c) Sick leave is applicable only in cases of bona fide illness or occupational injury covered by a doctor's certification. Sick leave will not be cumulative from one year to the next. Sick leave will not be paid if not taken for reasons of bona fide sickness or injury.

## ARTICLE 19
## HEALTH AND WELFARE

1. Prior to January 1, 2004, the Employer will continue the health and welfare insurance as set forth in its preceding collective bargaining agreement. On January 1, 2004 and thereafter, the Employer will continue the health and welfare insurance coverage currently in effect through the expiration date of the Employer's contractual agreement with a client, and thereafter the Employer shall provide employee-only coverage of its choosing per eligible security officer with the employee contributing as follows:

| Effective Date | Employee Contribution |
|---|---|
| 01/01/04 | 20% |
| 01/01/05 | 15% |
| 01/01/06 | 10% |
| 01/01/07 | 0% |

2. Any employer that does not require a co-payment or contribution from its employee for health insurance coverage as of June 5, 2003, shall maintain the status quo and not require the employee to remit any co-payment or contribution to maintain such insurance during the term of this Agreement.

## ARTICLE 20
## RETIREMENT

The Employer shall continue the retirement policies and procedures as set forth in its preceding collective bargaining agreement.

## ARTICLE 21
## PAY PERIODS

1. Under this Agreement, employees shall be paid not later than seven (7) days following completion of each pay period. All checks issued to employees must specifically state by date the period covered by such checks.

2. Employees may elect to receive their checks by mail or pick them up at the office of the Employer.

3. The Employer will cause a check to be made on any verified pay discrepancy exceeding $25, after the employee notifies the Employer's accounting department which check shall be made available no later than 3 days, excluding Saturdays, Sundays and holidays.

## ARTICLE 22
## BIDDING PROCEDURES

1. Bidding Procedures

Whenever the Employer bids or takes over the servicing of any job location, building or establishment covered by this Agreement, and where the daily work being performed amounts to eight (8) hours or more, the Employer agrees to retain all permanent employees at the job location, building or establishment, including those who might be on vacation or off work because of illness, injury or authorized leaves of absence, provided that employment will be offered to those employees who satisfy the hiring and employment standards of the Employer. If a customer demands that the incoming Employer remove an employee from continued employment at the location, the Employer shall have the right to comply with such demand and not offer that employee employment, then the outgoing employer will place such employee pursuant to Article 26, Section 2. The Employer will recognize the work time of the employees who are employed by it as continuous, regardless of change in employers, for the purposes of determining seniority and eligibility for sick leave and vacation benefits. The outgoing employer will be responsible to pay all wages and vacation accrued for each employee to the date of the takeover.

2. No Restrictions on Employment

a. Neither party will enter into any verbal or written agreement by which any employee covered by this Agreement is restrained from engage in a lawful profession, trade or business of any kind.

b. The Employer shall, within forty-eight (48) hours after execution of this Agreement, furnish the Union with a written list of jobs covered by this Agreement where daily work consists of eight (8) hours or more, specifying the names and address of all such locations. The Union agrees to safeguard this information as confidential and will not disclose it or any portion of it to anyone outside of the Union without the Employer's written consent.

c. The Employer will furnish to the Union in writing, the names and addresses of all such locations. The Union agrees to safeguard this information as confidential and will not disclose it or any portion of it to anyone outside of the Union without the Employer's written consent.

d. The Employer shall notify the Union, in writing, of any new job covered by this Agreement where the daily work consists of eight (8) hours or more, specifying the name of the job and the address of the job location.

3. New Non-Union Buildings

a. If after this Agreement has been implemented, the Employer desires to bid or is awarded the contract to provide security at a location which is not subject to this Agreement, the Employer shall set the wages and benefits provided the non-economic provisions of this Agreement shall apply to that particular building. Thereafter, the parties shall meet to discuss a reasonable progression of wage and benefits increases, provided that the economic terms of this Agreement shall apply to the non-Union building after the term of the first contractual agreement with the client, or two (2) years from the date the first contractual agreement became effective, whichever is shorter.

b. Any phase-in schedule agreed to by the parties shall not be deemed a violation of the Most Favored Nations provision as long as the phase-in scheduled is extended to any other signatory Employer who performs work at that particular building. That schedule shall be reduced to writing and shall be provided to other Employers upon request. Any Employer who takes over a building where a phase-in schedule is already in effect shall have the benefit of and be bound by that phase-in schedule.

## ARTICLE 23
## LEAVES OF ABSENCE

1. The Employer shall grant leaves from employment as required by federal and state laws. An employee desiring a leave of absence from employment for any reason must complete a written request for a leave of absence form and submit it to the Employer as soon as possible under the circumstances.

2. At the commencement of a leave from employment, an employee may request to be paid for unused accrued vacation. Payment will be made in accordance with the normal payroll procedures. An employee on a leave from employment under this Article shall receive paid benefits only if required by law and shall not accrue any other benefits under this Agreement except for the accrual of seniority for up to four (4) months as provided in Section 9 (Seniority) of this Agreement.

3. An employee who qualifies for and is granted a leave of absence provided by law will be reinstated to his or her former position or an equivalent position as required by law.

4. Time spent by an employee as a witness at the Employer's request is compensable at the employee's hourly rate of pay for the time the employee is required to appear as a witness. Where reasonable, the Employer may require that the employee work on the part of the day not spent in attending the hearing. If the employee receives witness fees, the Employer may require that the employee assign such witness fee check to

the Employer or, alternatively, will reimburse the employee for any difference between the witness fee and the amount the employee is entitled to under this section.

5. The reemployment rights of employees, who are now or may later be in military service and the duties of the Employer in relation to them, shall be governed by the applicable provisions of Federal and State Laws.

## ARTICLE 24
## GENERAL CONDITIONS/RULES

1. The employee shall conform to the printed rules and regulations of the Employer as now in effect and such further rules and regulations as may become necessary.

2. The Employer shall furnish to the Union copies of rules and regulations of general applicability to all employees, as well as any changes made thereto. This Section 2 shall not apply to rules applicable to a specific job site or post.

3. The Employer will establish stated call periods for each shift so as to minimize inconvenience to employees. Changes necessitated by seniority, changes in clients' needs, last minute orders, or other emergencies are recognized as exceptions.

4. The Employer shall comply with all applicable federal and Cal/OSHA laws and regulations pertaining to occupational health and safety, including the Hazardous Substance Information and Training Act.

5. No employee may work for a work period of more than five (5) hours without a meal period of not less than thirty (30) minutes, except that when a work period of not more than six (6) hours will complete the day's work, the meal period may be waived by mutual consent of Employer and employee. Unless the employee is relieved of all duty during a thirty (30) minute meal period, the meal period shall be considered an "on duty" meal period and counted as time worked. An "on duty" meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when an on-the-job paid meal period is agreed to in a written agreement between the Employer and employee. The parties agree that the nature of the work performed by a security officer may prevent him or her from being relieved of all duties necessitating an on-the-job paid meal period. An employee who did not receive a meal period must indicate such on his or her time card or Daily Activity Report for that week and initial such in the box indicating such, otherwise the Employer may assume that the employee received all meal periods as required by law. Disputes regarding meal periods shall be resolved only in accordance with Article 25 (Grievance and Arbitration Procedure), and the grievance may be filed within the time allowed by law,

provided that after exhausting said Grievance and Arbitration Procedure, the employee may then utilize other available legal means.

## ARTICLE 25
## GRIEVANCE AND ARBITRATION PROCEDURE

**Section 1**

During the term of this Agreement, all disputes and grievances shall be settled as quickly as possible by the Grievance Procedure provided herein except that the Employer may obtain injunctive relief from a Court to enforce Article 5 – Strikes. For the purpose of this Agreement, a grievance is defined as a difference of opinion between the Employer and the Union regarding only the meaning or application of this Agreement, presented to the Employer in writing within fourteen (14) days after it occurred, or when the employee or Union became aware of it, or should have become aware of it.

**Section 2**

An employee and/or Union Representative may consult directly with his or her Supervisor on a matter that does not necessarily constitute a grievance. In any case, where an employee is not satisfied with respect to the disposition of a matter regarding the meaning or, application of any provision of this Agreement, on which he or she has informally consulted with their Supervisor, the Union may submit the complaint as a grievance. The grievance will state, in addition to the employee's version of the facts, the specific portion of the Agreement allegedly violated, the date the alleged violation occurred and signed by the employee and the Union representative. If the grievance is filed on behalf of more than one employee, it may be signed by a Union representative.

**STEP 1**

The grievance shall first be submitted by the Union to the Employer's designated representative with a copy faxed to the Employer's designated facsimile number, and signed by the Union official, within fourteen (14) days from the date of the occurrence of the incident, or when the employee or Union became aware of it, or should have become aware of it. Such Employer designated representative shall, within seven (7) days after receiving the grievance, render his or her decision in writing.

**STEP 2**

If the grievance has not been settled or answered during the above specific number of days under the above procedure, the Union may submit the grievance to the Employer's designated Manager or his or her appointed representative by overnight delivery or designated Employer facsimile number within seven (7) days after receipt of the initial decision in Step 1 by the Employer's representative. The Employer's designated Manager or his or her appointed representative shall, within seven (7) days after the receipt of the grievance, render a decision thereon in writing by facsimile to the Union. If requested, the designated Manager will meet with the grievant(s) and/or appropriate Union representative(s) for the purpose of reviewing the matter.

The meeting shall be held on a mutually agreeable date within thirty (30) days following the request by the Union.

**STEP 3**

If the grievance has not been settled under the above procedure, the Union may submit the grievance for arbitration by written notice by overnight delivery or designated Employer facsimile number to the Employer's designated Step 3 representative within seven (7) days after the Step 2 meeting or if no meeting is held, within seven (7) days after the thirty (30) days referred to in Step 2. This written notice is separate and distinct from the request for a Panel of Arbitrators the Union may make to the Federal Mediation and Conciliation Service.

**STEP 4**

After the grievance is referred to arbitration per Step 3, the grieving party may request the Federal Mediation and Conciliation Service to provide the Employer and the Union a list of seven (7) persons who are qualified and willing to act as arbitrators. Within fifteen (15) days of the Union's receipt of the Panel of Arbitrators from the Federal Mediation and Conciliation Service, either party must contact the other for the purpose of selecting an arbitrator. Without waiving any of the time limits herein, if the parties mutually agree, they may select an arbitrator without use of the Federal Mediation and Conciliation Service.

**Section 3**

Any grievance shall be considered withdrawn with prejudice if not filed and processed by the Union, in strict accordance with the time limitations set forth above, unless time limits are extended or waived by mutual agreement in writing. Failure of the Employer to act within the time limit set forth in any step shall entitle the Union to proceed to the next step of the grievance procedure.

**Section 4** The award of such arbitrator shall be in writing and shall be final and binding upon the Employer, the Union, and the employee or employees involved. The arbitrator shall consider and decide only the particular grievance presented in the written stipulation of the Employer and the Union. The arbitrator's decision shall be based solely upon an interpretation of the provisions of this Agreement. The arbitrator shall not have the right to amend, take away, modify, add to, change or disregard any of the provisions of this Agreement. The parties to the case shall share equally the expense of the arbitrator, including the hearing room and transcript incurred with the arbitration. The transcript taken at the Arbitration Hearing will constitute the official record of the Hearing. The party or parties requesting the transcript shall incur the cost of the transcript. Neither party shall be required to purchase a copy of the transcript. The Employer and the Union are only responsible for the wages and expenses of its own representatives and witnesses.

**Section 5** Grievances involving discharge or indefinite suspension must be presented directly to Step 2 of the grievance procedure. Except where stated otherwise in this Agreement, a grievance by the Employer against the Union must be presented directly to Step 4 of the Grievance Procedure, except the phrase "Within seven (7) days of the Employer notifying the Union of its grievance in writing" shall be substituted for the phrase "Within seven (7) days after the meeting as cited in Step 2."

**Section 6** Without affecting any of the time limitations set forth herein, the Employer and the Union may settle the grievance.

**Section 7** In calculating time for purposes of this Article, Saturdays, Sundays and the Holidays cited in Article 14 shall not be counted. Time limits hereinabove mentioned may be modified, if desired, only in writing, by mutual agreement between the parties' designated representatives.

**Section 8** No more than one dispute may be submitted to any one arbitrator at the same hearing unless the parties agree to such in writing. If the Employer raises arbitrability as a defense to any grievance, that issue shall be resolved by a neutral arbitrator selected in accordance with Step 4 of Section 2 of this Article.

## ARTICLE 26
## MOST FAVORED NATIONS

1. If during the term of this Agreement, the Union enters into or honors an agreement or understanding with another employer or group of employers employing security officers working in similar facilities as covered by this Agreement that provides for more favorable hours, wages and/or terms and conditions of employment (as that phrase has been defined under the National Labor Relations Act, as amended) than those set forth in this Master Agreement, any employer bound by this Master Agreement shall be entitled to said more favorable hours, wages and/or terms and conditions upon request. To effectuate this Article of the parties' Master Agreement, the Union agrees to disclose the existence of any written or oral agreement or understanding it has or may have with any other employer.

2. If the Employer believes that the Union has entered into or is honoring an agreement or understanding that is more favorable as defined herein, the Employer shall notify the Union and the parties shall meet and confer to discuss such within the next 72 hours.

3. If the matter has not been resolved within 72 hours of notification to the Union, the Employer may request a list of seven (7) persons from the Federal Mediation and Conciliation Service. The parties will select an arbitrator using an alternate striking method.

4. The arbitrator shall decide the issue of whether or not the Union has entered into or is honoring an agreement or understanding with another employer or group of employers employing security officers working in similar facilities as covered by this Agreement that would allow the employer to be granted similar conditions as defined in Section 1 above.

## ARTICLE 27
## MANAGEMENT RIGHTS

1. A. Subject to the terms of this Agreement, the Employer shall have the exclusive right to manage and direct the workforce covered by this Agreement. Among the exclusive rights of management, but not intended as a wholly inclusive list of them are; the right to plan, direct and control all operations performed at the various locations served by the Employer; to direct and schedule the workforce; to determine the methods, procedures, equipment, operations and, or services to be utilized and, or provided or to discontinue their performance by the employees of the Employer and, or subcontract the same; to transfer, or relocate any or all of the operations of the business to any location or discontinue such operations, by sale or otherwise in whole or in part at any time; to establish, increase or decrease the number of work shifts, their starting and ending times, determine the work duties of

employees; promulgate, post and enforce reasonable rules and regulations governing the conduct and acts of employees during working hours; to require that duties other than normally assigned be performed; select supervisory employees; train employees; discontinue or reorganize or combine any part of the organization; to promote and demote employees consistent with the needs of the business; to discipline, suspend and discharge for reasonable cause; to relieve employees from duty for lack of work or any other legitimate reason; to cease acting as a contractor at any location or cease performing certain functions at any locations, even though employees at that location may be terminated or relieved from duty as a result. In no case will this Article be used for the purpose of unlawfully discriminating against any employees.

B. The foregoing statements of management rights and Employer functions are not all inclusive, but indicate the type of matters or rights which belong to and are inherent in management, and shall not be construed in any way to exclude other Employer functions and rights not specifically enumerated. Any of the rights, power or authority the employer had when there was no Agreement are retained by the Employer and may be exercised without prior notice to or consultation with the Union except those specifically abridged or modified by this Agreement and any supplementary subsequent agreement which may be made and executed by the parties.

2. The Union recognizes that the Employer provides a service of critical importance to the customer and that this Agreement shall be interpreted so as to give primary consideration to customer needs and preferences, provided that the foregoing will not be construed to abrogate any rights under this Agreement. If a customer demands that the Employer remove an employee from further employment at a location, the Employer shall have the right to comply with such demand. However, unless the Employer has cause to discharge the employee, the Employer will place him/her in a job at another service location covered by this Agreement at the wages and benefits in effect at that location, and if those wages and benefits are not as favorable as those he or she enjoyed at the prior location, the security officer will be offered the next available job position at another location where the wages or benefits are more favorable.

## ARTICLE 28
## WAIVER

If any provisions of this Agreement or the application of such provision to any person or circumstances be ruled contrary to law, by any Federal or State Court or duly authorized agency, the remainder of this Agreement or the application of such provisions to other persons or circumstances shall not be affected thereby. The parties acknowledge that during the negotiations which resulted in

this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining and that the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Therefore, the Employer and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter not specifically referred to or covered in this Agreement, even though such subjects or matters may have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement, except as required by law.

The wages and fringe benefits set forth in the Master Agreement and any Appendices are minimum conditions and the Employer may provide greater wages and/or fringe benefits in its sole discretion.

## ARTICLE 29
## DURATION AND TERMINATION

This Agreement shall become effective on July 1, 2003, and shall remain in full force and effect through June 30, 2007, when it shall terminate and shall thereafter renew year to year, unless either party desires to modify or terminate this Agreement at the end of its term. Written notice must be provided to the other party at least sixty (60), but not more than ninety (90) calendar days, prior to the expiration date in accordance with the National Labor Relations Act, as amended.

**ABM SECURITY SERVICES/ AMERICAN COMMERCIAL SECURITY SERVICES**

By [signature]

Title Regional Manager

Date 7-1-3

**BARTON PROTECTIVE OF CALIFORNIA, INC.**

By [signature]

Title Vice President

Date 7-1-03

**SERVICEEMPLOYEES INTERNATIONAL UNION, LOCAL 24/7**

By Steve McClenathen

Title President

Date 7/1/03

By Larry B. Williams Jr.

Title V.P.

Date 8/6/03

**LIGOURI ASSOCIATES, INC.**

By ____________

Title President

Date June 16, 2003

**UNIVERSAL PROTECTION SERVICE**

By ____________

Title President

Date 7-1-03

**SECURITAS COMPANY**

By ____________

Title Area Vice President

Date July 1, 2003

**PROFESSIONAL TECHNICAL SECURITY SERVICES, INC.**

By ____________

Title [illegible]

Date 7-1-2003

**SENTINEL GUARD SYSTEM** per MOU. Attached

By ____________ (Glenn Gilman)

Title President

Date [illegible]

**COGNISA SECURITY, INC.**

By ____________

Title CFO

Date 9/2/04

By ____________

By ____________

By ____________

By ____________

By ____________

By ____________

By ____________

By ____________

By ____________

By ____________

By ____________

By ____________

By ____________

By ____________

By ____________

**SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 24/7**

By ____________

Title President Local 24/7

Date August 26, 2004

# AGREEMENT

The Service Employees International Union, Local 24/7 ("The Union") and Forbes Security ("The Employer") hereby agree to the following:

1) The Employer and the Union shall be bound by the terms and conditions contained in the Agreement between Service Employees International Union, Local 24/7 (IUSO) and ABM Security Services / American Commercial Security Services, Allied Security, Barton Protective California, Inc., Ligouri Associates, Inc., Universal Protection Services, Securitas Co., Professional Technical Security Services, Inc. and Sentinel Guard System.

2) The Employer and the Union agree to a card check of the majority of workers.

3) The Employer agrees to provide all relevant information to the Union to ensure that the Collective Bargaining Agreement is enforce.

4) Company will provide proof of medical coverage which conforms to or is similar to others of the Collective Bargaining Agreement.

5) This agreement shall take effect on the date of its signing.

Union, Service Employees International Union, Local 24/7

____________ President Date: 8-6-04

Employer, Forbes Security

By ____________ Date: 08-06-[illegible]

## SIDE BAR LETTER OF UNDERSTANDING

WHEREAS, the Employers, ABM SECURITY SERVICES/AMERICAN COMMERCIAL SECURITY SERVICES, BARTON PROTECTIVE OF CALIFORNIA, INC., LIGOURI ASSOCIATES, INC., UNIVERSAL PROTECTION SERVICE, SECURITAS COMPANY, PROFESSIONAL TECHNICAL SECURITY SERVICES, INC. (ProTech) (hereinafter each referred to jointly as the "Employers") and the Union, SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 24/7, (hereinafter referred to as the "Union") are parties to a collective bargaining agreement effective from July 1, 2003 through June 30, 2007, (hereinafter referred to as the "Agreement"), covering the wages, hours and working conditions of various security officers employed by the Employers and represented by the Union, and

WHEREAS, the Employers and the Union have agreed, without waiving or altering any provision in the Agreement, to meet informally in the month of September 2003, so that representatives of the Union and/or its affiliated health and welfare trust fund (hereinafter referred to as the "Trust Fund") may provide the Employers with information regarding said Trust Fund, without any commitment on the part of the Employers, it is therefore,

AGREED that on a date, and at a time and location set by the undersigned representatives of the Employers and of the Union, the Employers and the Union will meet informally in the month of September 2003, without any party waiving or altering any provisions of the Agreement, for the purpose of representatives of the Union and/or its affiliated Trust Fund providing the Employers with information regarding said Trust Fund without any commitment on the part of the Employers.

Robert L. Rediger
Attorney for the Employers

Dated: 6/24/03

Michael Baratz
Chief Negotiator for the Union

Dated: 8-14-03

## SIDE BAR LETTER OF UNDERSTANDING

WHEREAS, the Employer, ABM SECURITY SERVICES/AMERICAN COMMERCIAL SECURITY SERVICES, (hereinafter the "Employer") and the Union, SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 24/7, (hereinafter the "Union") are parties to a collective bargaining agreement effective from July 1, 2003 through June 30, 2007, (hereinafter the "Agreement"), covering the wages, hours and working conditions of various security officers employed by the Employer and represented by the Union, and

WHEREAS, the Employer and the Union have agreed during the collective bargaining process that resulted in the Agreement to a revised schedule of contributions from Employees covered by the Agreement for health and welfare insurance coverage, it is therefore,

AGREED that from July 1, 2003 through December 31, 2003, employees covered by the Agreement shall remit a monthly contribution toward health and welfare insurance coverage as follows:

| | |
|---|---|
| $50.00 | for single employee coverage |
| $175.00 | for employee plus one (1) dependent |
| $300.00 | for employee plus two (2) or more dependents. |

Effective January 1, 2004, the schedule of contributions will be that set forth in the Agreement.

ABM SECURITY SERVICES/
AMERICAN COMMERCIAL
SECURITY SERVICES

Dated: 7-1-03

SERVICE EMPLOYEES
INTERNATIONAL UNION
LOCAL 24/7

Dated: 7-1-03

## AGREEMENT

The Service Employees International Union, Local 24/7 ("The Union") and Allied Security, Inc. ("The Employer") hereby agree to the following:

1) The Collective Bargaining Agreement between the Union and the Employer signed on November 16, 2000 and effective from November 16, 2000 to November 16, 2005 is hereby terminated.

2) The Employer and the Union shall be bound by the terms and conditions contained in the Agreement between Service Employees International Union, Local 24/7 (IUSO) and ABM Security Services / American Commercial Security Services, Barton Protective of California, Inc., Ligouri Associates, Inc., Universal Protection Services, Securitas Co., Professional Technical Security Services, Inc. and Sentinel Guard System, attached hereto as Attachment I (Master Agreement), as modified by the exceptions set forth in the Employer's Counter Proposal of Negotiations dated 12/12/2003, attached hereto as Attachment II.

   The "account exception list" referred to in the Employer's Counter Proposal is attached hereto as Attachment III.

3) This agreement shall take effect on the date of its signing.

| Union, Service Employees International Union, Local 24/7 | Employer, Allied Security, Inc. |
|---|---|
| [signature] President Date: 12/18/03 | [signature] By Date: 12/18/03 |
| [signature] Negotiation Committee | |

## ALLIED / SEIU LOCAL 24/7 (IUSO) ATTACHMENT II

1) **Wages:** Employer will meet area agreement minimum wage standards and minimum raise requirements effective 01/01/04 but for those locations on the account exceptions list;

2) Uniform Maintenance Allowance commences 01/01/04 (same implementation as # 1);

3) President's Day will be recognized effective after 01/01/06;

4) **Training:** as written in Area Agreement, however the Union must supply confirming letters from all signatory companies are in compliance, including during initial on the job training;

5) Marin, San Mateo and Sonoma service locations are subject to the same economic parameters applicable to Alameda/ Contra Costa County Service locations;

6) **Medical Insurance:** Allied Agrees to participate in the Health Care Employees/Employers Medical Trust (provided it is an opt-in only plan) and will pay 80% of employee only costs for 2004. This will be implemented as soon as practical. Subsequent years, Allied Security will be subject to the terms of the Area Agreement;

7) Terms and conditions as agreed to in Area Agreement;

8) Alameda and Contra Costa Area Standards Implementation – Effective 01/01/05 all existing Alameda / Contra Costa County existing accounts (but for PeopleSoft and Alta Bates Summit Medical center) shall have Union representation as demonstrated by a majority card count process by using a mutually agreed upon recognition procedure. All new accounts acquired by Allied shall be subject to the terms of the area agreement upon settlement;

**ATTACHMENT III**

| CLIENT | EXCEPTION YES/NO (INFO IF YES) |
|---|---|
| Arundel | YES MARCH '04 |
| Coast Counties | YES JANUARY '05 |
| 98 Battery | YES JANUARY '05 |
| KQED | YES JANUARY '05 |
| Philippine Center Mgt. | YES JANUARY '05 |
| Tech TV | YES JANUARY '05 |
| Olympic Club | YES APRIL '04 |
| Brannan | YES JULY '04 |
| Karren Co. | YES MAY '04 |

**MEMORANDUM OF UNDERSTANDING BETWEEN SENTINEL INC. AND SEIU LOCAL 24/7 IUSO**

Sentinel Guard Systems agrees to participate in negotiations for, and be bound by, and sign the agreement that will be developed as a result of the Security Contractors Agreement currently being negotiated between SEIU Local 24/7 (IUSO) and Security Employers in the Bay Area during the spring of 2003 with the following modifications as discussed below.

Sentinel Guard Systems currently has an existing agreement, which expires on February 1, 2004. In exchange for Sentinel's canceling the existing agreement and signing the new agreement in the Spring of 2003, the SEIU Local 24/7 (IUSO) agrees to the following for Sentinel Guard Systems:

(1) The wage and economic provisions of the current union agreement in force ending February 1, 2004 will be honored for Sentinel for its existing San Francisco area accounts and accounts for which proposals are outstanding as of March 21, 2003 (a list of those accounts is attached).

(2) All existing and proposed accounts will convert to the wage and economics of the new agreement to be developed in the Spring of 2003, no later than February 1, 2004, however in locations where the client agrees to implement sooner, the account shall be converted to the new agreement at that time.

(3) All other work coming from new bids submitted after March 21, 2003, including re-bids of existing work shall fall under all terms and conditions of the new agreement to be negotiated during the Spring of 2003.

It is the intent of the parties that all existing work and work bid previously shall be treated by the Union as if it was bound by the economic terms and conditions of the existing agreement expiring February 1, 2004 and that the wage and economic terms of the new agreement shall not apply to that work until the existing agreement expires. Sentinel based on these agreements by SEIU Local 24/7 (IUSO) agrees to negotiate and sign a new agreement earlier (Spring of 2003) and will be bound by its terms for all proposals submitted after March 31, 2003 becoming work prior to February 1, 2004.

Signed and Executed on April 1st, 2003

| For Sentinel Guard Systems | For SEIU Local 24/7 (IUSO) |
|---|---|
| Glenn Gilmore | [signature] |
| President | President |

# AGREEMENT

Between

**SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 24/7**

Local 24/7
SEIU

*and*

**GUARDSMARK, LLC.**

(Effective September 1, 2004 through April 30, 2007)

## AGREEMENT

*Preamble*

This Agreement is entered into on August 18, 2004, between SEIU, Local 24/7 (hereinafter referred to as "the Union") and Guardsmark, LLC (hereinafter referred to as the "Employer").

The Union and the Employer want to work together to provide the best possible security services. To this end, the Union and the Employer agree to resolve their problems through the procedures provided for in this contract and not by taking internal disputes to the customer for resolution. Only by cooperation and understanding each other's needs and the realities of the market place, can both the Union and the Employer prosper.

## ARTICLE 1
## RECOGNITION

The Employer recognizes the Union as the exclusive representative for the purpose of collective bargaining of all security officers ("employees") employed by the Employer in the City and County of San Francisco, and in the counties of Alameda (excluding the cities of Hayward, Newark, Fremont, Union City and UPS facilities) and Contra Costa, including within the San Francisco International Airport, as guards, watchmen, patrolmen, fire and patrol, and/or security officers who are not covered by the Waterfront Agreement; excluding all office employees and supervisors, as those terms have been defined under the National Labor Relations Act, as amended and all other employees; provided existing non-Union accounts in Alameda, Contra Costa counties and within the San Francisco International Airport, shall not be subject to the terms of this Agreement until the termination of Employer's contractual agreement with the client that meets the terms of this Agreement, whichever occurs earlier. If the Employer has accounts that are unionized as of the effective date of this Agreement, in the cities of Hayward, Newark, Fremont or Union City, said accounts will be covered by this Agreement.

## ARTICLE 5
## NO STRIKES

There shall be no strikes (including unfair labor practice and sympathy strikes), work stoppages, job action, disparagement, distribution of literature regarding any labor dispute on the property of any client of the Employer or by an employee in uniform at any time, or lockouts, during the term of this Agreement. In the event of a strike by another labor group involving the client's property or operations, the employees will remain on the job. Employees shall be required to perform their normal duties.

Further, security employees shall not be subject to penalty of punishment by the Union for performances of assigned duties at any time. These duties are recognized as including the apprehension, identification and reporting of and giving evidence against any persons who perform or conduct themselves in violation of work rules or applicable laws while on the Employer's or the client's premises. Violation of the provisions of this Article will subject security employees to disciplinary action up to and including discharge. Such disciplinary action shall be subject to the grievance and arbitration procedure of this Agreement.

The Employer will reimburse a guard or patrolman for damages incurred to his personal property as a result of the performance of his assigned duties under strike conditions. In order to be eligible for such reimbursement, a guard or patrolman must:

(a) Report to the Employer as soon as reasonably possible, in writing, all of the facts and circumstances regarding damages incurred;

(b) Have exercised reasonable care for the safety of his personal property; and

(c) Complied with the Employer's reasonable instructions regarding such property.

The Employer will be responsible to make payments under this paragraph only with respect to property which is damaged within the immediate area of the site of the employee's work. The Employer will have the option of paying to the employee either (a) the cost of repairing the damaged property, or (b) the value of the property prior to its having been damaged, whichever is lower.

## ARTICLE 12
## WAGES

1. The starting hourly wage rates for employees shall be as follows:

| | 09/01/04 | 01/01/05 | 01/01/06 | 01/01/07 |
|---|---|---|---|---|
| San Francisco | $10.50 | $10.75 | $11.00 | $11.30 |
| Alameda and Contra Costa | $9.25 | $9.50 | $9.75 | $10.05 |

2. Employees may, in the sole discretion and judgment of the Employer be assigned to the following classifications where their primary duties in the judgment of the Employer make it appropriate to be so assigned on a permanent basis:

| | | | | |
|---|---|---|---|---|
| **San Francisco** | | | | |
| Administrative Assistant | $15.00 | $15.25 | $15.50 | $15.80 |
| Control Room Operator | $13.00 | $13.25 | $13.50 | $13.80 |
| X-Ray Machine and Magnometer Operator | $12.00 | $12.25 | $12.50 | $12.80 |
| Locksmith | $16.00 | $16.25 | $16.50 | $16.80 |
| Shuttle Bus Driver | $15.00 | $15.25 | $15.75 | $16.05 |
| **Alameda and Contra Costa** | | | | |
| Administrative Assistant | $13.50 | $13.75 | $14.00 | $14.30 |
| Control Room Operator | $11.00 | $11.25 | $11.50 | $11.80 |
| X-Ray Machine and Magnometer Operator | $11.00 | $11.25 | $11.50 | $11.80 |
| Locksmith | $15.00 | $15.25 | $15.50 | $15.80 |
| Shuttle Bus Driver | $14.00 | $14.25 | $14.50 | $14.80 |

3. The hourly wage rates of employees shall be increased as follows:

If the employee does not receive an hourly wage increase of at least $0.25 during the calendar year, he/she will receive the difference between what was received and a $0.25 increase that following January 1, 2005, 2006 and $0.30 January 1, 2007.

4. No employee employed on the date this Agreement is signed will suffer a reduction in his or her hourly wage rate as a result of the parties signing this Agreement.

## ARTICLE 14
## HOLIDAYS

1. The following eight (8) holidays shall be recognized for all employees on the days on which they are legally observed:

| | |
|---|---|
| Thanksgiving Day | Memorial Day |
| Christmas Day | July 4th |
| New Year's Day | Labor Day |
| Martin Luther King, Jr. Day | |

2. Work performed on any holiday enumerated in paragraph 1 above, shall be paid for at one and one-half (1½) times the basic hourly rate. All work on such holidays in excess of eight (8) hours shall be paid at two (2) times the basic hourly rate. Holiday pay at premium rates will be paid for hours worked within the twenty-four (24) hours calendar day of the holiday.

3. For purposes of the holidays listed in paragraph 1, all officers who are regularly scheduled to work that day of the week, but do not work due to their regular work location being closed, will be paid eight (8) hours regular straight-time pay.

4. In order to qualify for holiday pay, employees must work their last regularly scheduled shifts before the holiday and their next regularly scheduled shifts following the holiday, provided, that employees who are absent on one (1) or more such days due to approved vacation or sick leave shall be entitled to holiday pay, and provided further, that employees who are absent on one or both of such days due to FMLA leave, or medical leave or personal leave previously approved by the Employer, shall be entitled to receive holiday pay only upon their return to active employment.

5. Employees scheduled to work on a holiday who do not report for work and fail to call in prior to their starting time shall not be eligible to receive holiday pay. Any employee who takes an extra day off in connection with the holidays provided for in this Article for reasons not justified, shall be subject to progressive discipline by the Employer.

6. On state and national general election days, the work shall be arranged so as to allow the employees time to vote without loss of pay.

7. The Employer will make every effort to schedule work for any full-time employee who requests it, whose regular shift is cancelled on a holiday.

8. The first eight (8) hours of work performed at the holiday overtime rate shall be considered straight time in determining when overtime shall become payable under the Fair Labor Standards Act. Payment of overtime for holidays worked shall not relieve the Employer from payment of overtime for hours worked in excess of forty (40) hours a week or eight (8)

hours a shift as provided in Article 12. There shall be no pyramiding of premium or overtime pay for the same hours worked.

9. The Employer shall include President's Day as a paid designated holiday in Section 1 in 2006.

10. The Employer shall continue its holiday policies and procedures for employees assigned from its Oakland office and at SF MOMA, except that Martin Luther King Day is added and Easter Sunday is deleted.

***NOTE:*** Double time pay when working a holiday.

## ARTICLE 19
## HEALTH AND WELFARE

1. Employer shall provide and maintain the current or comparable employee-only coverage of its choosing provided that the carrier may be changed from time to time during the term of this Agreement in Employer's discretion. Such coverage is a medical plan and dental and optical plans for accounts where provided under the prior collective bargaining agreement and in accounts where such coverage is agreed upon between the Employer and its client. Coverage shall be provided to an eligible regular employee security officer with the employee contributing as follows:

| Effective Date | Employee Contribution |
|---|---|
| 01/01/04 | 0% |
| 01/01/05 | 0% |
| 01/01/06 | 0% |
| 01/01/07 | 0% |

2. Employer may, in its discretion, require no co-payment or contribution from its employee for health insurance coverage.

3. By January 1, 2006, Employer shall provide that the deductible for the San Francisco employees shall be equal to the same level as that of the Oakland employees.

## ARTICLE 20
## RETIREMENT

The Employer shall continue the retirement policies and procedures as set forth in its preceding collective bargaining agreement.

## ARTICLE 29
## DURATION AND TERMINATION

This Agreement shall become effective on September 1, 2004, and shall remain in full force and effect through April 30, 2007, when it shall terminate and shall thereafter renew year to year, unless either party desires to modify or terminate this Agreement at the end of its term. Written notice must be provided to the other party at least sixty (60), but not more than ninety (90) calendar days, prior to the expiration date in accordance with the National Labor Relations Act, as amended.

**NOTE:**

1. Each full time active employees of Guardsmark who has worked for Guardsmark in the area recognized by the Collective Bargaining Agreement between the parties for at least 1600 hours in the year preceding September 30, 2004 shall receive a gross payment of $100, no later than September 30, 2004.

2. Each full time active employee who qualified under paragraph 1 and who worked under the Collective Bargaining Agreement between the parties for a second one year period and worked at least 1600 hours in the year preceding September 30, 2005, shall receive second gross payment of $100 no later than September 30, 2005.

**SIDE LETTER**

It is Guardsmark's position that the classification of statutory supervisors includes those Guardsmark employees designated as Captains, Lieutenants and Sergeants.

Andy Stern
International President